Mr. McCurry? Yes. Good morning. You may proceed. May it please the Court. Your Honor, Jeff McCurry for Appellant Choice Escrow and Land Title, LLC. The issues presented regard whether the loss from a $440,000 fraudulent and unauthorized wire transfer is borne by Choice Escrow as the customer or BancorpSouth as the bank under Section 4A.202 of the Mississippi Uniform Commercial Code. Under Article 4A, BancorpSouth bears the loss unless it can shift the loss to Choice under the three requirements of Section 4A.202B. Before you get into the depths of all that, can I just ask a quick question? Sure. Does everyone agree that Mississippi law applies to all portions of this case? I believe so, Your Honor. I believe it's admitted in the pleadings. Okay. Thank you. Your Honor, under Article 4A, BancorpSouth bears the loss unless it can shift the loss under 4A.202B, which Choice has called a three-legged stool. It's BancorpSouth's burdens at all times to prove all three legs, and failure to prove any one of the three legs of the stool is fatal to its case. I'd like to take the commercial reasonableness of the security procedure leg first, a little out of order with my briefing. Your Honors, I believe this is the clearest leg in Choice's favor because BancorpSouth has admitted the key fact, that being that its security procedure did not perform transactional analysis, meaning its security procedure never looked at the payment order itself. Rather, its security procedure exclusively authenticated the user at the login stage of the computer process. Transactional payment order analysis is required in 4A.202C, which is the provision that guides the court on how to determine commercial reasonableness, where it states that the court shall consider the circumstances of the customer known to the bank, Well, what about the dual-control option? Yes, Your Honors. Single-control and dual-control are the two different options here, and the only difference of dual-control is an additional user ID and password. Again, it is still authentication at the login phase, and never looks at the actual payment order itself. No review of the size of the payment order occurs because of dual-control versus single-control, or the type or the frequency of the payment orders. It's only having someone else log in and verify that's who that person is. And I believe it's the code comments that clarify that looking at only the user is insufficient. In the comments, which are at the joint appendix in 765 through 767, the drafter stated as follows. There is no way of determining the authority or the identity of the person who caused the message to be sent. Rather, the receiving bank relies upon a security procedure, pursuant to which the authenticity of the message can be tested. Employees of the bank can be trained to test the payment order, according to the various steps in the security procedure. And most importantly, in comment four on the joint appendix 767, it says that in a wire transfer, each payment order is transmitted individually. A testing procedure will be individually applied to each payment order. We believe this is BankCorpSAL's fatal flaw with regard to its security functions. It only focused on trying to authenticate the user and perform no review at all of the payment order, which means that that section of 48202C, which says you have to consider the circumstances of the customer, never occurs in BankCorpSAL's security functions. The problem with BankCorpSAL's analysis is that section 48202C controls commercial reasonableness, not the 2005 guidance. The 2005 guidance is not law passed by the Mississippi legislature. The 2005 guidance never uses the phrase commercially reasonable and never references Article 4A. Your Honors, we believe this fact that you must do transactional analysis is exemplified in the PACCO case out of the First Circuit. In that case, the court found that the bank had multifactor authentication under the 2005 guidance and yet still found the security procedure to be commercially unreasonable based upon its analysis of 48202C, that it must adjust its security procedure based upon the circumstances of the customer and must review the payment order itself. None of BankCorpSAL's security functions consider the size, the type, or the frequency of any of Choice's payment orders at any time. We believe this admission by BankCorpSAL requires judgment in favor of Choice on the first leg. Your Honors, the second leg I'd like to discuss is the good faith aspect. BankCorpSAL had the burden to prove that it accepted the March 17, 2010 payment order in both subjective and objective good faith. Subjective is not at issue here. We have no issue with trying to prove subjective good faith. Objective is defined as the observance of the reasonable commercial standards of fair dealing. It's inherent that before you prove that you observed the standards, you must establish what those standards are because the Article 48 does not tell us what the standards of good faith are. But we need to start by clearing up one assertion by BankCorpSAL that has no support in the record. There has been and never has, there never was, an agreement that the 2005 guidance is the objective standard of good faith in this case. The District Court was able to skip its analysis as to whether or not BankCorpSAL had established the standard because it relied upon this misrepresentation that there was an agreement. So the question then becomes, did BankCorpSAL's expert ever state that the 2005 guidance is the objective standard of good faith in his report? We believe he failed to do so, and as a result, since the District Court entered an order that an expert's testimony is limited to the opinions that are provided in the written report, that BankCorpSAL has not and cannot establish the objective standard of good faith since its expert never opined on it. Your Honors, we believe this is also similar to the Experimental case. In Experimental, the Court found it dispositive that the bank had the burden to establish what the standard is, and the bank failed to do so in that case because their expert was not qualified to establish what those standards are. We believe when the Court reviews Mr. McAhone's report that it will be unquestionably clear that he discussed the commercial reasonableness of the security procedure. He used the phrase commercially reasonable over 20 times. He cited to the statutory language about commercial reasonableness. We do not believe he ever talked about the objective standard of good faith or good faith at all. In citing the statutory language he relied upon, as I said, he talked about 4A.202B, which has both the commercial reasonableness aspect and the good faith, but he intentionally removed the quoted language about good faith. That language in 4A.202B, a good faith, is not in his report. The definition of commercial reasonableness is in his report, 4A.202C. The definition of good faith is nowhere to be found in his report. Your Honors, we believe that this idea that the 2005 guidance is not only, according to Bancorp South, all it has to follow with regard to a security procedure. We believe this assertion that it is the objective standard of good faith for a bank to accept a payment order is a creation of Bancorp South and has no support in the record from its expert, as such an opinion was never given. Your Honors, again, we filed a summary judgment motion on this, so therefore we believe our first motion for summary judgment should be granted regarding the good faith issue, but they've also filed a summary judgment motion where they bear the burden to prove all the undisputed material facts. Not a single one of its 115 material facts ever states what the objective standard of good faith is. They talk about things that their security procedure did, but no statement ever says the 2005 guidance is the objective standard and then the citation to Peter McAuliffe doesn't exist. In their supporting suggestions on good faith in their summary judgment, it's only two and a half pages long. Nowhere in those two and a half pages is the 2005 guidance cited or is Peter McAuliffe's name cited. Mr. McAuliffe did not intend to opine on good faith. None of his headings regard good faith. The headings he provided, Your Honor, our argument on headings, which has been blown out of proportion, is simply that parties provide headings to tell a reader what you're about to read about. Every one of his 11 headings was an accurate description of the opinions he gave. Not a single heading provided the reader the concept, I'm about to talk about good faith. Your Honor, the last leg of this. What, if anything, did you identify as the standard for good faith? Your Honor, we haven't done that. I do believe that is something an expert must do. I can't stand here not knowing banking internet security to establish what that objective standard is. That's for an expert. We never asked our expert, Brad Merriman, to do so because it's their burden to do so, first of all, as the experimental case says, and second of all, we don't think they ever did it. If it's their burden and they never established the standard, that's their burden to prove. So I standing here, that's why we say it has to be an expert. I can't get on the witness stand and say I think the objective standard is this. Was there no expert testimony? We were on summary judgment, Your Honor. So, no, there's just the reports. But your expert doesn't opine on that. Our expert has no opinion whatsoever in the record on objective, on good faith at all, just about commercial reasonableness. Every opinion he provided had to do with the commercial reasonableness of the security procedure because we, our law firm, employed the expert, and we never asked him to give any opinions about good faith. Your Honor, the last leg I'll briefly touch on, which I think is the simplest, is the limiting instruction. 4A202B provides that a customer can instruct a bank on limitations at once with regard to its payment orders. I don't think there's really a question that there's been a judicial admission that this email was an instruction. The one-word answer of admit from Bancorp South to our paragraph 61 under the Davis and Bryce cases are a clear statement that they are admitting that as a judicial fact and that it can't be contradicted by evidentiary admissions later in the record. Didn't the request use the term and or? It does, Your Honor, and I don't think that's a distinction in which in any way lessens the admission. I believe what they were trying to cite to is that it somehow makes it an equivocal admission, but I don't think the admission is equivocal. What they're complaining about is the way we pled our paragraph. Their remedy is to either say we need a motion for more definite statement as to what you're saying or to admit in part and deny in part. They say we've just admitted one of the three. Which one? How do we know? I think and slash or, it's defined in the dictionary as we described it as kind of like joint and several liability. It means it's all three collectively and all three individually. If they wanted to admit one or two and not the third of what we said it was an instruction, a wish, and a requirement, they could have done that. By saying just admit, they admit the whole thing. And, Your Honor, so on the instruction, we do believe they did not comply with it since it obviously went to the Republic of Cyprus and that our second motion for summary judgment should be granted. And if there's no questions, I'll reserve for rebuttal. One quick question. Do you have any evidence or authority that a security procedure is commercially reasonable only if it has transactional analysis? Do I have any evidence that it must have transactional? Or authority. Yes, Your Honor. I do believe it's from the code itself where it says that you must consider the size, type, and frequency of payment orders. Isn't that like a list of things to be considered as opposed to a mandatory proposition? I think it says including, meaning it's not an exclusive list, but I think those are some of the things that you should be including if it's part of it. And then there's the PATCO case where they talk about the mandate. PATCO does a great job of laying out. The First Circuit lays out exactly what this is about. And in there, they had a risk scoring ability, but they didn't functionalize it, meaning the wires that were coming up were getting high risk scores, meaning it was really risky, but they didn't have the alarm set off. It didn't stop the wire. They at least had the functionality. Bancorp South didn't even offer that functionality. So, yes, Your Honor, I do believe PATCO, and this is like the third case of these Article IV-A fraudulent wire transfers, so there's not a lot of case law on this, but I do believe that the code comments are very clear that you cannot authenticate the person. You have to authenticate the paperwork. Thank you, Your Honor. Mr. Price? Yes, Your Honor. Good morning. You may proceed. Good morning. May it please the Court. Bancorp South's position is that the trial court, Judge Moffmer, spent a great deal of time reviewing what you can see as a very voluminous summary judgment record, and he got it absolutely right. What we have here are some rather strained interpretations of the statutory language and relying upon comments over the actual language of the statute to try to engraft requirements that the industry does not recognize. First of all, with regard to whether the security procedure was commercially reasonable, the focus here is on dual control. That is the linchpin of Judge Moffmer's entire opinion, and what Choice neglects to advise either the district court or this court is that whatever the security procedure was, if it was just a user ID and a password, that is deemed to be commercially reasonable if a procedure was offered to Choice that it declined and that procedure which was offered was commercially reasonable. So what we have to look at and what Judge Moffmer looked at is... How would it have made a difference in this case if they had taken that choice? I'm sorry, I couldn't... How would it have made a difference in this case in the transaction if they had... If they'd had dual control. Yeah. Okay. The way dual control works is that one user sitting at their computer with their username and password has to request the wire transfer electronically. It goes into the bank's system, but it cannot be released until a separate user with their own user ID and password authorizes it to be released. So what would have happened here is we would have had this $440,000 request come in to send money to a bank in Cyprus, and someone else at Choice Escrow would have had to review that and say grace over it before it was authorized to be released. By declining dual control, they enabled a situation where this request is made by one user using her password. The request came with the same IP address as her computer. It came with the recognized device token ID on her computer, which is all part of this security procedure. And there is no way that the bank's system could detect that this was someone fraudulently utilizing her computer. In effect, what apparently happened here, and the experts seemed to agree on this, was that somebody sitting somewhere in Eastern Europe, probably, was able to take over Ms. Black's computer at Choice Escrow and place the order essentially through her computer. If dual control had been in place, that wouldn't have happened because someone else using their own computer that these fraudsters didn't have access to would have had to approve it. So, under the code, if we offered them dual control and if that was commercially reasonable and they declined it, then whatever security procedure in place is deemed to be commercially reasonable. That's the actual language of the code. We have here two instances where they were offered dual control that both were declined. And the written memo that Choice Escrow signed to waive dual control, because that's the bank's requirement. If you're going to waive it, you have to sign a document that says you've waived it. That memo warned of exactly what happened here. Then, in November of 2009, about six months before this wire transfer incident, there was a second occasion where there was communication between Choice and the bank. And the bank again said, you need to use dual control. If you don't, there's a risk that someone can steal your passwords and take over your computers and wire transfer your money. Again, declined by Choice Escrow.  Now, is transactional analysis and a real-time fraud monitoring system required? It is not. There's nothing in the language of the code itself which talks about transaction analysis or requires it. The 2005 guidance that's been referred to by the FFIEC, which is a regulatory body that governs all financial institutions, that guidance document doesn't require transactional analysis. And Choice, in its brief at page 63, acknowledges that that guidance is the standard against which to judge commercial reasonableness. So we have a situation where dual control was offered, declined twice. That was commercially reasonable. Their expert admitted that in his deposition, and we've cited that in our brief. So we have a situation where commercial reasonableness is taken out of the picture, essentially, by their decision to decline dual control because the security system that BancorpSouth had in place without dual control is deemed commercially reasonable under the law. The second issue that is raised primarily is this issue of good fit. Where are they getting the transactional analysis from, comments? Transactional analysis is something that Choice's expert brought into this matter. It is not mentioned in the comments. It's not mentioned in the code language itself. It's not mentioned in the 2005 guidance. One other place it is mentioned is in this experimental case that they rely on, where the court specifically one of the arguments there was that the bank's procedure was not reasonable because it didn't have transactional analysis. The court in experimental, their main case they rely on, rejected that argument and has a very good discussion of that, basically saying that where transactional analysis may be a good idea, but nothing in the UCC language itself requires it. It's not a recognized tool in the industry yet, and so we're not going to hold the bank responsible for not having it. Turning to the issue of good faith, the main case that I think the court ought to focus on here is this main family federal credit case that both parties cite, which says that in deciding what these standards of good faith and fair dealing are under the UCC, the test is whether the conduct, and here the conduct is reviewing and deciding to honor this payment order, the electronic transfer payment order. That's the conduct. Did that conduct comport with, quote, industry or commercial standards applicable to the transactions? There's nothing in that case, there's nothing anywhere except in Choices Brief, that says that these standards that we're talking about have to be tied to the buzzwords good faith or fair dealing. That is their invention in this case. What the case law says is that the standard has to be, quote, industry or commercial standards applicable to the transaction. Both experts' reports, indeed, their second amended complaint, repeatedly refers to this 2005 FFIEC guidance as the banking industry standard for addressing these electronic payment orders. Granted, it doesn't say this is the standard for good faith. That's not required anywhere. Now, however, Mr. McCohan, our expert, who has advised some of the biggest banks in the country, specifically addressed good faith in his report. At section 9.5 of his report, he states, and I quote, based on the source IP address of the requested wire transfer belonging to Choice, the presence of a secure cookie, and the use of a valid username and password, the bank accepted the payment order in good faith. It's in black and white in his report. Choice did not, they asked him about many of the sections of his report. They read to him verbatim from his report in his deposition, and they chose not to ask him one single question about that section of his report or the topic of good faith at all. Their expert in his deposition was asked, do you have an opinion that the bank acted in bad faith? He said, no, I don't have any opinion on that. So what do we have here that Judge Mofford was looking at? He has both parties' experts repeatedly referring to these 2005 standards as the industry standard for banking practices. He has our experts saying the bank acted in good faith based on the exact circumstances of this wire transfer, and he has Choice's experts saying, I have no opinion on that. I think it's very clear that Judge Mofford correctly ruled that there was no controverted issue of fact on this, and he correctly granted summary judgment in Bancorp South's favor. Very quickly, the issue of whether there was an instruction from Choice to block wire transfers and this whole issue of whether there was a judicial admission. We don't believe there was. Their pleading says it was a wish, requirement, and, slash, or instruction. We admitted that. We think it probably was their wish, but we don't think it was an instruction, and, in fact, when Mr. Payne, the principal of Choice Escrow, was deposed, and this is at Joint Appendix 596 and 600, he said on two different occasions,  he never used the word instruction. He never contended it was an instruction. He's the author of the email that they're relying upon for this. So if we can't go to the person who wrote the email as the best source for what that meant, I don't know what we can do. There was no instruction, but even if you construed this to be an instruction, you've got to go on to the next step of the analysis, which is, does that instruction violate a written agreement between the parties? And I can't probably go into all of the detail of that for you right now, but it's laid out explicitly in our brief. There are at least two of the agreements that Choice Escrow signed, the funds transfer agreement and this dual waiver memo. Both of those documents both say that wire transfers to foreign countries cannot be stopped, either by the automated system or by the bank. That's in the written agreements that they signed. An alleged instruction by Mr. Payne at Choice Escrow to block wire transfers violates the terms of those two written agreements, and so it's ineffective under the code, even if you find that it was an instruction in the first place. Finally, I want to turn really, really briefly to our counterclaim. Bank Corp South filed a counterclaim in this action seeking to recover its attorney's fees and expenses incurred in defending this case under the terms of several of the written agreements between the parties. They're all detailed in the brief. Judge Moffmer dismissed, granted a motion to dismiss that counterclaim because he believed, in his words, that the way it was framed, it could require Choice to actually pay back the wire transfer funds themselves if they recovered in this case. In other words, they recover against Bank Corp South, and then these agreements require them to pay the money back immediately. Well, that's not what we were asking for, and I think Judge Moffmer misunderstood. We've detailed in the brief that in our counterclaim, in our suggestions in opposition to their motion to dismiss, and in a motion for reconsideration of the dismissal order, we laid out in great detail that we were only seeking to recover attorney's fees and costs in the event that Bank Corp South prevails here on this summary judgment. And you agree that Mississippi law applies to this counterclaim, right? I'm sorry, Your Honor. Does Mississippi law apply to the counterclaim? I think we all agree that Mississippi law applies. The UCC in Mississippi is identical to the UCC in Missouri. The case law is fairly sparse, so it really doesn't matter. We would ask the court to affirm this summary judgment. Thank you. Thank you. Your Honor, briefly on their cross-appeal, if the court resolves Choice's appeal in Choice's favor, it's a moot point. Nonetheless, we ask that the court grant our motion to strike the arguments that were put forth that were never argued below, including specifically this prevailing party argument. The only time they asked for this type of attorney fee relief of a prevailing nature was in their motion to reconsider, which was not appealed to this court. The motion to dismiss is what they've appealed, and no such argument was presented to the trial court in the motion to dismiss documents, which occurred a year earlier. And quickly, hitting on the multitude of reasons we said they can't get attorney's fees anyway, this is an indemnity provision for any and all loss. That's what the parties agreed to. We can't now shift and cherry-pick out parts in order to avoid displacement of Article 4A when they weren't considering it. We are now being asked by Bancorp South to transfer this from an indemnity provision to a prevailing party attorney's fee clause, and that rewriting of the contract cannot be done. On commercial reasonableness, Your Honor, we were discussing transactional analysis. Does the language of the code directly say the words transactional analysis? Of course not. The words transactional analysis means the transaction at hand. Article 4A has lots of different types of transactions. I'm sorry, the UCC has lots of forms of transactions. Article 4A is specific to payment orders, funds transfers. There's only one way to consider the size, type, and frequency of a payment order. You have to look at the payment order. Authenticating at login in no way considers anything about the size, type, or frequency of a payment order, and we strongly suggest or urge the court to look at the comments indicating that the identity of a person cannot be identified. Size, type, and frequency, where does that language come from? In 4A202C. It's where you find the definition of how you find commercial reasonableness. The wishes, the circumstances of the customer, it's all listed there. Dual control, Your Honor, you were asking about. Ask how it would have made a difference. First of all, that's not a consideration for this court. Section 202C never asks, in hindsight, could this thing have prevented the wire transfer? That's never the standard. The standard is what are we supposed to have had at the time? Not in hindsight would it have worked because it's speculation. They say Brooke would have been the only one that had been hacked. How do we know that? What if the hacker would have gone in and got the other one? It's an assumption that's not a part of the analysis, Your Honors, and we have never admitted that 2005 guidance is the standard. The code says it is a this-customer, this-bank flexible analysis, not a baseline standard. Your Honors, I see I'm out of time. We believe that Mancorp South has failed its burdens, and we ask for judgment in our favor. Very well. Thank you. The case is well argued, well briefed, and we'll take it under consideration. That completes our argument calendar for this morning. So we'll be in recess until 8 o'clock tomorrow morning.